Sreeo, J.,
delivered the opinion of the court:
The prisoners have appealed in error from a judgment of death pronounced against them by the circuit court of Putnam county, for the murder of Pussell Allison. The homicide was committed in Putnam county, about midnight on the night of the 29th of ÜSTovember, 1875. The deceased was a youth, and was asleep at his own home, when the prisoners, with two other men, entered the yard, and advancing to the house, demanded admittance in a rude and boisterous manner, under the pretext of wanting their sapper. The d_eceased was sleeping upstairs, and his stepmother and another lady were in the bed below.. All were awakened, and the women were frightened by the extraordinary noise without. The deceased, who had been a school-fellow of these two prisoners, recognized their voices, *597 and evidently suspecting no evil design, spoke to the frightened women below, telling them not to be alarmed, that it was the Braswell boys. He then came down stairs, lighted a candle, and opened the door. The prisoners entered with pisiols drawn and presented, with their faces blackened, and their persons otherwise disguised. The two confederates remained outside. One of them, a man named Bates, was jointly indicted with these defendants, and his case, after a severance, is still pending in the circuit court, while the other, named Johnson, became a witness for the state in the prosecution of the prisoners.
The two prisoners at the bar were fully recognized and identified by the deceased, who lingered some thirty-six hours after the mortal wound, and by other inmates of the house. There can be no shadow of doubt upon the proof that the prisoners committed the homicide, and there can be as little doubt that, the jury, in their verdict, have ascertained the the proper grade of their guilt.
It appears that soon after the prisoners entered the house, one of them took hold of the deceased, and-a scuffle ensued between him and the deceased, in which the deceased, calling one of the prisoners by the familiar nickname by which he was known in the neighborhood, said deprecatingly to him, “Don’t do that, Teek,” to which the prisoner replied, “Let go my pistol.” The other prisoner thereupon exclaimed with an oath, “I can make him turn it loose,” and a pistol was instantly fired. After mortally wounding the deceased, one of the prisoners fired at the women in the bed, and then left the house.
It is shown that several shots were fired by the prisoners while in the house, and one or more in the yard outside.
It appears that the tax collector of the county at that time was a son of the proprietor of the house where the homicide was committed, and that he frequently called at his father’s to spend the night
The theory of the prosecution is, that the purpose of the *598 prisoners was to rob the tax collector, who, it seems, was expected at the house that night.
Without invoking the slightest aid from the testimony of their accomplice, Johnson, we have no donibt, from all the circumstances, that robbery was their object, and that being thwarted in this by the absence of the tax collector, they proceeded to the murder of the inmates of the house to fortify themselves against detection.
But, without the auxiliary feature of any other intended or attempted felony, as established by the witness, Johnson, we are of the opinion that the case made by the state presents every essential element of the high crime of which the prisoners stand convicted.
The witness, Johnson, was an accomplice in the crime, lie stood before the court and jury confessedly of bad and suspicious character. But it is not true, as a matter of law, that an accomplice in crime is not to be believed. It is for 1he jury, the triers of credit, to determine whether or not he has told the truth. In our practice, however, it is usual and proper for the court, out of abundant caution, to admonish the jury, as was done in this case, not to convict upon the uncorroborated testimony of an accomplice. 1 Greenl. Ev., p. 381. But this corroboration need not extend to the whole body of the testimony. If it be shown that the accomplice has told the truth in some materal matters, the jury may very well infer that he has in others. Comon v. Bosworth, 22 Pick., 397; Ros. Cr. Ev., 120; 1 Greenl. Ev., p. 381.
It is impossible to consider the testimony of the witness, J ohnson, in this case, in connection with all the other testimony in behalf of the state, and doubt for one moment that he has told the truth. He gives a detailed and circumstantial account of a formal conspiracy entered into between himself and these two prisoners and Bates that night, to proceed to the house where the homicide was committed, for the express purpose of robbing the tax collector, who *599 was expected there that night. It was stated by one of the parties to the conspiracy that there wonld be four thousand dollars in the house that night, and that six hundred of the amount was hidden in the clock; His narrative of all the particulars of the expedition, of the transactions at the house, and of the circumstances that occurred afterwards, is so closely and thoroughly confirmed by other undoubted testimony, that it is impossible to doubt or discredit his statement. With his testimony, then, we have a clear case of homicide, committed in an attempt to commit robbery, which the law denounces as the highest grade of crime. . •
But it is insisted, on behalf of the prisoners, that there are certain errors of law .in the record for which a reversal is demanded. And first, that the court erred in allowing the declaration the deceased made directly after the mortal wound was given, to the effect that these prisoners had killed him, to go to the jury. The testimony of Mrs. Isbell thus gives the circumstances under which this declaration was made: “After some firing, I don’t know how many shots, Bussell, the deceased, ran into the dining-room. As he w ent through the door, Joseph Braswell fired at him. He returned in a little time; as he came in the Braswells went out, and a pistol or two fired out of doors. As he came in from the dining-room, he said, 'Angie, I am shot. Teek and Jo. Braswell are the ones that shot me.’ When Bus-sell came in at the door and told me he was shot, he said he was hurting. Defendants could have heard him. They were right about the door.”
This declaration was so near to the main fact as to make it a part of the transaction. We think it was properly admitted as the res gestee.
Many courts have undertaken to lay down a rule as to what is to be considered as the res gestee, both as to matters of crime and other transactions, which are the foundation of civil litigation. The definition of Hosmer, Ch. J., in Enos v. Tuille, 3 Conn. Rep., 250, has been generally *600 accepted "by the text writers as the best approved. In regard to declarations, he says: “To be a part of res gestae, the declaration must have been made at the time of the act done, which they are supposed to characterize, and well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize with them as obviously to constitute one transaction.”
“It is difficult,” said Shaw, Oh. J., “to lay down any rule as to the cases in which declarations are admissible as part of the res gestae.” 11 Pick.,309.
But even with a rule, the main difficulties at last arise on its application. 1 Phil. Ev., 151; 1 G-reenl. Ev., p. 108. The illustrations often cited in the books are what the wife said immediately on receiving an injury, as in the casp of Thompson et ux v. Trevanion, 6 East, 138; 1 Skinn., 402; and in prosecution for manslaughter, what the person killed had said immediately upon receiving the fatal injury. Rex v. Foster, 6 C. & P., 325.
The doctrine does not presuppose that the assailing party heard the declaration, or that it was at all necessary that he should hear it in order to have an opportunity of denial. The proof of an accusation in the presence of the party accused of crime, stands upon a different principle. The declaration in the other case is admitted, not because it is an accusation, but because it is a part of the transaction which is undergoing investigation.”
“The idea of the res gestae presupposes a main fact,” said the supreme court of Georgia. “The res gestae means the circumstances, facts, and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character.” Mitchem v. The State, 11 Geo. Rep., 615.
But the rule does not require that the circumstances or declaration proposed to be given in evidence should have occurred at the precise time when the principal fact happened. If it arose either at the time, or so soon thereafter *601 as to constitute a part of the transaction, then it seems to give color and definitiveness to it. Sample v. Robb, 16 Penn. State Rep., 305.
"VVe apprehend that whatever was then and there said and done immediately before or after the transaction, which is inseparably identified with and calculated to explain it, may be properly classified as part of the res gestae. The declaration in such a case is a verbal act, and does not stand for an accusation, but stands for a fact. If the deceased had been shot by the prisoner with a rifle or shotgun, within full view, and had immediately cried out that the prisoner had shot him, this would be a fact inseparable from the transaction itself, and would have been admissible as part of it — -not as conclusive against the prisoner, 'but for what it was worth, as a verbal act constituting a part of the res gestae. The illustration presents an extreme case. In the case before us, the declaration was made immediately after the fatal shot, and in the presence, and no doubt in the hearing, of the prisoners. We have no doubt upon the point oí the admissibility of this declaration. But even if it were a merely doubtful matter, we could not reverse so just a judgment upon and in the presence of such over-Avhelming proof that the prisoners were the guilty agents in the perpetration of this crime.
It is next assigned for error that the counsel for the state wrere permitted, over the objection of the prisoner’s counsel, to ask John Sliger, one of defendant’s witnesses, if he had not been indicted for counterfeiting. It does not appear that the witness himself objected to answering the question. The objection came from the prisoner’s counsel, and the court required the witness to answer, which he did ip. the affirmative, stating that he had been indicted and that he was ready to meet the accusations.
The rule sought to be invoked by the prisoner’s counsel by interposing his objection, was intended for the protection of the witness himself. It is his privilege to decline *602 to answer any question tending to bis own crimination. But outside of this, there is and should be no restraints upon the right of a party litigant to test, in every conceivable manner, by the crucial test of cross-examination, the credit of a witness who is brought to the bar to swear away his rights. The object of the trial is to demonstrate the truth, and the object of the cross-examination is to strip and expose falsehood and perjury, when it seeks to pollute the fountains of public justice. Truth only dreads the cross-examination, because the adroit inquisitor may involve it in temporary confusion and embarrassment; but falsehood trembles before it, because it is the best and surest detective of perjury. It was settled at an early day in this state, and is the recognized principle of the common law everywhere, that a witness cannot be compelled to answer a question which subjects him to penalties or a criminal charge. Quarles’ Dig., 887; 2 Ter., 110. But when the answer he may give does not render him liable to penalties or a criminal prosecution, and does not directly and certainly show his infamy, but will only tend to disgrace him, or to expose his unreliability as a witness, he may be compelled to answer. 1 Greenl. Ev., p. 456, note.
‘Tt used to be said,” observed Lord Elder, “that a witness could not be called on to discredit himself, but there seems to be something like a departure from that. I mean that in the modern times the courts have permitted questions to show from transactions not in issue, that the witness is of impeached character, and, therefore, not so credible.” Parkhurst v. Lawton, 2 Swumerst, 216; 1 Greenl. Ev., p. 459.
The mere fact of the witness having been indicted neither subjects him to penalty or the further indictment for crime. Lie is still presumed to be innocent until convicted. The answer to such an inquiry might tend to expose him and to weaken the force of his testimony; but it scarcely falls within the rules intended for his own protec *603 tion, and is certainly not sucb a question as the prisoners could object to. By his introduction they indorse his verity and credit, and if the prosecution could, in a legitimate way, destroy that credit, it is not only his right but his dury to do so, in the interest of public justice.
The prisoners in this case undertook to prove an alibi. Among other witnesses who testified thereto, was the sister-in-law of the prisoners and the wife of James Braswell, who stated that one of the prisoners stayed at her house all night on the night of the murder. She said that her husband was there, and that he was aware of the presence of the prisoner in the room, and that he had arisen in the night to supply the prisoner with cover upon his becoming cold. This person, James Braswell, who might have corroborated his wife’s testimony upon the question of alibi, was not introduced, and no reason was assigned for his nonintroduction. Under these circumstances, the court charged the jury that “wherever pertinent and material evidence, by which an alibi might, if true, have been supported, is withheld, it is a circumstance against the truth of the alleged alibi.” There was no error in this charge. We think this singular omission was a circumstance that threw strong suspicion on the defense of the prisoners.
In every matter of judicial investigation the paramount object is to eliqit the truth. No court and jury have a right to ignore inferences and presumptions which naturally grow out of the facts established in proof. Indeed, the woof and warp of evidence is made up of the substantive facts proven, and the presumptions and inferences which are generated by the facts, all of which are necessary to bring the mind at last to a logical conclusion. It was said in the case of Crane v. Astor, 6 Pet. Rep., 598, that no court has a right to direct a jury to disregard presumptive proof, or to view it under a different aspect from that in which it is actually presented. They are to decide on its proper *604 influence, and on the order and manner in which they weigh it, and any interference with this right would be an invasion of the privilege. 6 Pet., 598. The rule is laid down by Mr. Stailde, that if a party be pressed by circumstantial pf oof, having it obviously in his power to destroy its apparent force, if unfounded, by testimony on his own side, but he omit to do so, the very omission supplies a presumption against him. 8 Stark. Ev., 487 [1 Stark. Ev., 488]. And thus it is held that when it is in the power of a prisoner to furnish complete evidence, the absence of it creates a strong presumption against him. People v. McWhorter, 4 Barb., 438; People v. Bodine, 1 Druid, 281; People v. Dyle, 21 N. Y. Rep., 578; 1 Phill. Ev., 516.
The charge of his Honor, in this respect, involved nothing more than the logical inference from the facts, which, as a matter of evidence, they had a right to consider, with or without the charge. And we think it was amply sustained by the authorities we have cited.
We think the jury were well warranted in discrediting their attempted proof of an alibi, and that the court very properly charged, also, in this connection, that a reasonable doubt as to the truth of the alibi must be generated, not alone upon the testimony as to the alibi, but that the testimony must all be considered together. This is strictly in accord with the rulings pf this court upon that subject.
It would be a simple mockery for a jury to conjure up a doubt upon any subject upon any question which is the subject of investigation, without considering the testimony on both sides, of the question. A doubt thus generated would not be a reasonable doubt, but an arbitrary and capricious one, which no intelligent mind could, for a moment, entertain.
It is objected here, in argument, for the first time, that the witness, Johnson, was permitted to detail a conversation had with the prisoners, after the homicide, in which one of the prisoners proposed that the party go into the spurs *605 of the mountains and engage in the business of highway robbery. It Avas held in Kinchelow v. The State [5 Hum., 9], that eAÚdence of a distinct substantive offense shall not be admitted in support of a charge for another offense; and a fortiori shall not evidence of an intention to commit another offense be received. 5 Hum., 9; 2 Hum., 86; 4 Hum., 27. This is undoubtedly the law, but the testimony in this case Avas admitted below without objection at the time, and Avithout any request for its exclusion afterwards, and the exception comes too late.
The next and last exception proper to be noticed is to that portion of the charge upon the effect of the prisoners resisting ah arrest as a matter of evidence against them. Bpon this point the court charged as folloAvs:
“If the prisoners flee after the crime is committed, it will be a circumstance against them, or if they arm themselves and resist arrest, that Avill, also, be a circumstance against them. But if they do not flee, and do not resist arrest, these would be circumstances in their favor.”
It is a familiar principle that the flight of the accused, and concealing, or showing anxiety to conceal, evidence of guilt, are circumstances for the prosecution. 1 Phill. Ev., 497. And so it is held that attempting to escape by knocking down the officer, are alike circumstances for the prosecution. 1 Wheel. Cr., ch. 91. And so says Mr.,Starkie. Or attempts to divert the course of inquiry, or prevent investigation, and other singular measures for security, dictated by conscious guilt. 8 Stark. Ev., 492. Upon these general and undoubted principles, Ave think the charge of the court, in this respect, was Avell Avarranted.
It Avas in proof that the prisoners were armed with deadly Aveapons after the homicide; that they avowed their determination not to be arrested; and that they did resist the arrest. These circumstances had the effect to generate any other presumption than that of conscious innocence, which *606 always invites investigation, ’and they were very properly submitted to tire jury for what they were worth.
Upon the whole case, we are satisfied that these defendants have had a fair and impartial trial; that the proof demonstrates their guilt heyond a doubt; that they have forfeited their lives to the violated law, and the judgment must he affirmed.